UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

YELTSIN BELTRAN

                    Plaintiff                            19 CV____ (   ) (   )

                                                         Jury Trial Demanded

          -against-

THE CITY OF NEW YORK;
Detective O'LEARY, Shield No ____,
Detective BRIAN SHEA, Shield No._____,
Individually and in their official capacities as
NEW YORK CITY POLICE OFFICERS.

                           Defendants.

----------------------------------------------------------------------x

Plaintiff, Yeltsin Beltran, by his attorney, Rudy Velez, Esq., complaining of the defendants, the

City of New York, and its employee police officers, collectively referred to as Defendants, upon

information and belief, alleges as follows:

## NATURE OF ACTION

1.  This an action to recover money damages arising out of the malicious prosecution

    under 42 U.S.C § 1983 under the Constitution of the United States.

## JURISDICTION AND VENUE

2.  This action is brought pursuant to 42 U.S.C ss1983 and 1988, and the Fourth, Fifth,

    Sixth and Fourteenth Amendments to the Constitution of the United States.

3.  The Jurisdiction of this Court is predicated upon 28 U.S.C §§ 1331 and 1343.

4.  Venue is proper in this district pursuant to 28 U.S.C §§ 1391 (b) and (c).

## JURY DEMAND

5.  Plaintiff demands a trial by jury in this action.

## PROCEDURAL HISTORY

6.  Plaintiff served a Notice of Claim in writing sworn on Plaintiff's behalf upon
    Defendant CITY, by delivering a copy thereof to the officer designated to receive such
    process personally, which Notice of Claim advised the Defendant of the nature, place,
    time and manner in which the Claim arose, and items of damage and injuries sustained
    so far as was then determinable.

7.  More than thirty days have elapsed since service of said notice, and defendant CITY
    has failed to pay or adjust this claim.

8.  A 50-H hearing was held on April 27, 2017.

9.  This action had been commenced within three years after the cause of action of
    Plaintiff accrued on May 23, 2016, with a full dismissal of all criminal charges.

## PARTIES

10. Plaintiff Yeltsin Beltran (Mr. "Beltran") is a resident of Bronx County in the City and
    State of New York.

2

11. Defendant Detective Brian Shea, Shield No. 924483, at all times relevant herein, was an officer, employee and agent of the NYPD. Defendant Shea is sued in his individual and official capacities.

12. Defendant O'Leary, at all times relevant herein, was an officer, employee and agent of the NYPD. Defendant O'Leary is sued in his individual and official capacities.

13. The Defendant, City of New York is a municipality in the State of New York and employs the Defendant Police officers.

## FACTUAL BACKGROUND APPLICABLE TO ALL COUNTS

14. At approximately 2 A.M on September 25, 2013, Plaintiff, was lawfully at the Bora Bora Club located in the vicinity of University Ave., Bronx New York.

15. On October 11, 2013 Defendant Detective Shea and Defendant Detective O' Leary of the 46th Prescient, Bronx, N.Y, without probable cause and or justification, unlawfully arrested and detained the Plaintiff, Mr. Beltran.

16. The Plaintiff was subsequently charged with Murder and Manslaughter. All charges were subsequently dismissed by the assigned prosecutor David Greenfield (Bronx, District Attorney) on May 23, 2016.

17. Prior to and after effecting the malicious prosecution against Mr. Beltran, Mr. Beltran was present at the Bora Bora Club, with no knowledge of any crime. The police claim that on September 25, 2013 the Plaintiff and one other (unapprehend), left the Bora Bora Club on University Avenue, crossed the street to the west side of University Avenue where the Plaintiff asked the witness and Wayne Freeman if they were form the Sedgwick Houses. Once Wayne Freeman responded, the Plaintiff took out a gun and started firing. Wayne Freeman died as a result of an injury to his femoral artery.

3

The witness was shot once in the back, but survived. The police also claim there were
no known witnesses to the events. A subsequent investigation proved these facts to be
false and malicious regarding Plaintiff's involvement.

18. Pursuant to a short term investigation, the police conducted a photo array on October
7, 2013 and a line-up on October 11, 2013. The plaintiff was allegedly identified on
both occasions.

19. During the course of preparing the only alleged witness for hearings and trial, the
witness informed the assistant district attorney that he had in fact viewed more than
one photo array.

20. The witness stated that while recovering in the hospital a detective showed him a "six
pack" and the defendant was not among any of the photos displayed.

21. The witness also stated that after he was released from the hospital, and while at his
girlfriend's apartment, the witness stated that he saw yet another array at that time but
was unable to make any identification.

22. The witness in fact was coerced and intimidated into picking out the plaintiff on
October 7, 2013 (photo array) and at the line-up on October 11, 2013.

23. The only reason the witness initially identified plaintiff was because he was threatened
and intimidated by the aforementioned police to do so.

24. Once the assistant district attorney began to question the witness in preparation for
trial, the police misconducted unraveled.

25. The aforementioned detectives maliciously initiated the prosecution against plaintiff
by closing out this case with no credible investigation and by telling the witness who

4

to identify or else. The police detectives focused on Beltran because he was the perfect "Patsy" due to his checkered past.

26. The police claimed there was only one witness when in fact, there was another witness and no follow-up was ever done with the second witness.

27. Subsequent to Mr. Beltran's arrest he was photographed, booked and processed at central booking. He was arraigned on the aforementioned charges but was remanded by the Bronx County Criminal Court Judge and remained incarcerated until his release 5/23/16.

28. On May 23 the Bronx District Attorney filed a recommendation for dismissal alleging that the people were unable to establish Beltran's identity at trial. All the charges were dismissed. Mr. Beltran spent approximately 2 ½ years incarcerated and suffered not only a loss of his freedom, but great distress including the alienation from his family.

29. Plaintiff suffered damages as a result of defendant's actions. Plaintiff suffered emotional distress, mental anguish, fear, severe anxiety, embarrassment, and humiliation, damage to his reputation, financial collapse and loss of freedom.

## FIRST CLAIM FOR RELIEF

### Monell Claim

30.Plantiff repeats and re-alleges each and every allegation contained in paragraphs "1-29" of the complaint as if fully set forth herein.

31. The acts complained of were carried out by the aforementioned POLICE DEFENDANTS in their capacities as POLICE OFFICERS and officials pursuant to customs, policies, usages, practices, procedures and rules of the City an NYPD, all under the supervision of ranking officers of the NYPD.

32. The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1" arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely searing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference toward to constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

33. At the time of the aforementioned constitutional violations, the City of the NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such as the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference of the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part "infra", the need for more effective supervision and other meaningful attempt to prevent future constitutional violations.

34. The existence of aforesaid unconstitutional customs and polices may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

> a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);
>
> b. Long v. City of New York, 09-CV-6099 (AJK) (S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.) (officer swears out a false compliant and is convicted of falsifying police records);

c.  Taylor v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y) (police
    officers at 24th precinct issue four summonses to a woman in retaliation
    for her lodging a complaint with the Civilian Complaint Review Board
    against the precinct);

d.  Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest
    a person lawfully photographing an arrest of a bicyclist in Times Square
    and swear out criminal complaints that are contradicted by video
    evidence);

e.  Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (In an Order
    dated November 29, 2009 denying the City's motion to dismiss on
    Igbal/Twombley grounds, wherein the police officers at issued were and
    prosecuted for falsifying evidence, the Honorable Jack B. Weinstein
    wrote:

    'informal inquiry by the court and among the judges of this court, as
    well as knowledge of cases in other federal and state courts, has
    revealed anecdotal evidence of repeated, widespread falsification by
    arresting police officers of the New York City Police Department.
    Despite numerous inquiries by commissions and strong reported
    efforts by the present administration-through selection of candidates
    for the police force stressing academic and other qualifications,
    serious training to avoid constitutional violations, and strong
    disciplinary action within the department-there is some evidence of
    an attitude among officers that is sufficiently widespread to
    constitute a custom or policy by the city approving illegal conduct
    of the kind now charged'

f.  People v Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics
    detective found guilty planting drugs on two innocent civilians; former
    undercover NYPD narcotics officer, Steve Anderson, testified that fellow
    narcotics officers routinely maintained a stash of narcotics to pant an
    innocent civilians in order to help those officers meet arrest quotas; Mr.
    Anderson testified concerning the NYPD's practice of "attaching bodies"
    to the narcotics to make baseless arrest stating: "It was something I was
    seeing a lot of, whether it was from supervisors or undercovers and even
    investigators. Seeing it so much, it's almost like you have no emotion to
    it. The mentality was that they attach bodies to it; they're going to be out

of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it- being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrest officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest during a "vertical patrol" of a public housing project despite evidence that he had legitimate reason to be on premises);

i. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. McMillan v. City of New York, 04-CV-3990 (FB)(RML) (E.D.N.Y.)(Officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.) (same);

l. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y,) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the

officer's suspicion less, racially-motivated stop-and –frisk of a group of
Hispanic youths);

o.   Richardson v. City of New York, 02-CV-3651 (JG)(CLP)
(E.D.N.Y.)(Officer fabricated evidence including knowingly false sworn
complaints, against an African-American man in Kings County and
initiated drug charges against him, despite an absence of any quantum of
suspicion);

p.   Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable
issue of fact where NYPD  sergeant alleged retaliatory demotion and
disciplinary chares in response to sergeant's allegations of corruption
within her unit and alleged the NYPD had "unwritten but persuasive
custom of punishing officers who speak out about police misconduct and
encouraging, if not facilitating, silence among officers");

q.   White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.
Supp. 365 380 (S.D.N.Y., 1997) (holding that the  NYPD had an
"unwritten policy or practice of encouraging or at least tolerating a
pattern of harassment directed at officers who exposed instances of
police corruption"); and

r.   Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis
20250 at 14(E.D.N.Y.) (Police officer alleges retaliatory duty
assignments and harassment in response to his allegations about a
racially-discriminatory workplace; on motion for summary judgment, the
Court held that the police officer had established proof of both a
widespread usage of policy to regulate against police officers who
exposed police misconduct and a failure to train in the police
department).

35. The existence of the aforesaid unconstitutional customs and practices, **specifically
with regard to the practice or custom of officers lying under oath, falsely
swearing out criminal complaints or otherwise falsifying or fabricating evidence,**
are further evidenced, inter alia, by the following:

a.   The Mollen Commission concluded that police and falsification of official
records is probably the most common form of police corruption facing the
criminal justice system, It concluded:

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrest and never questioned them.

{...}

What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" - doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "what's wrong with that? They're guilty."

b.  In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

10

> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are not finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told the Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.

d. In 2007, former NYPD officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting the brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "Planting drugs on suspects and stealing cash during gambling raids." The 109th precinct to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to being legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, member of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."

e. In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

> The Officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources.

> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

> To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting...

11

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters,' a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.

f.  In early 2010, the City settled a civil rights lawsuit wherein one officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the women $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.

g.  Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations- in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.

36. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, inter alia, by the following:

a.  With respect to Fourth Amendment violations, in Ligon v. City of New York, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that

PLAINTIFFS challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard, " including failure to train and constructive acquiescence. Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

b.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report") dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted-especially a Department that needs the public's confidence and partnership to be affective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

c.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread…custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "when it happens, it's not for personal gain. It's more for convenience."

e.

In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement

payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra-they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This show, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.

f.  Regarding defendant City's tacit condonemeant and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct. When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% IN 2007, and approximately 30% in 2008. Alarmingly, the NYPD had refused to prosecute 40% of the cases sent to it by the CCRB in 2009. As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions of the matter was simply dropped by the NYPD rose 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.

37. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct**, are further evidenced, inter alia, by the following:

a.  In a suit filed in 2012, officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.

b.  In Griffin V. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.

c.  Former New York County District Attorney Robert Morgenthau had been quoted as acknowledged that, in the NYPD, there is "code of silence," or a "code of protection" that exist among officers and this is followed carefully;

d.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

e.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

38. The existence of the above-described de facto unlawful polices and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including with limitation, Commissioner Kelly.

39. The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.

They do so with the knowledge and approval of their supervisors, commanders and
Commissioners Kelly who all: (I) tacitly accept and encourage a code of silence
wherein police officers refuse to report other officers' misconduct or tell false and/or
incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the
CCRB and the Internal Affair Bureau ("IAB"), and in public statements designed to
cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in
the absence of video evidence blatantly exposing the officers' perjury, fail to discipline
officers for "testifying" and/or fabricating false evidence to initiate and continue the
malicious prosecution of civilian in order to cover-up civil rights violations perpetrated
by themselves, fellow office supervisors and/or subordinates against those civilians.

40. All of the foregoing acts by defendants deprived PLAINTIFF of his federally
protected rights, including, but limited to the constitutional rights enumerated herein.

41. Defendant City knew or should have known that the acts alleged herein would deprive
PLAINTIFF of his rights under the Fourth, Fifth and Fourteenth Amendments to the
United States Constitution.

42. Defendant City is directly liable and responsible for the acts of Defendants, as it
repeatedly and knowingly failed to properly supervise, train, instruct and discipline
them and because it repeatedly and knowingly failed to enforce the rules and
regulations of the City and NYPD, and to require compliance with the Constitution
and laws of the United States.

43. Despite knowledge of such unlawful de facto policies, practices, and/or customs, these
supervisory ad policy-making officers and officials of the NYPD and the City,
including Commissioner Kelly, have not taken steps to terminate these policies,

16

practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional right of persons in the City of New York.

44. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest PLAINTIFF without probable cause and then fabricate and swear to a false story to cover up their blatant violations of PLAINTIFF'S Constitutional rights. Pursuant to the aforementioned City policies practices and/or customs, the officers failed to intervene in or report Defendants' violations of PLAINTIFF'S rights.

45. PLAINTIFF'S injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, the train and discipline their police officer.

46. As a result of the foregoing, PLAINTIFF was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

**SECOND CLAIM FOR RELIEF**

17

**42 U.S.C § 1983 Violations for Malicious Prosecution**

47. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "46" of the complaint as if fully set forth herein.

48. By their conduct, as described herein, and acting under color of state law, defendants are liable to Plaintiff Yeltsin Beltran under 42 U.S.C § 1983 for the violation of his constitutional rights to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

49. On or about September 25, 2013 the defendants intentionally, and with malice caused the commencement of a criminal prosecution against Yeltsin Beltran in the Criminal Court of the City of New York, County of Bronx upon the filing of an accusatory instrument knowing they had corrupted the identification Beltran by the witness and the arrest was made with manufactured probable cause. The criminal proceeding was instituted with malice.

50. In commencing and continuing the said malicious prosecution, defendants caused Yeltsin Beltran to be falsely charged and prosecuted and during the prosecution of Yeltsin Beltran, not only intimidated and coerced the witness, but in so doing properly failed to investigate the alleged crime. There was no probable cause to arrest the plaintiff and the police were aware of this fact from the beginning of their involvement in Plaintiff's arrest.

51. The defendants knew or should have known through the exercise of reasonable care and proper police procedure that said investigation and further prosecution into this matter was based on police misconduct and a deliberate intention to circumvent the

Fourth Amendment by intimidating, threatening and coercing the witness to identify the plaintiff. The commencement and continuation of this criminal proceeding against plaintiff was malicious "ab initio."

52. As a direct and proximate result of defendant's unlawful actions, plaintiff has suffered, and will continue to suffer damages including mental and emotional injury, mental anguish, suffering, humiliation, embarrassment, and was incarcerated for approximately 2 ½ years. The criminal proceeding was dismissed on May 23, 2016 and this terminated the proceeding in plaintiff's favor. See exhibit A Recommendation for Dismissal.

## THIRD CLAIM FOR RELIEF

### 42 . S.C. §1983 Federal Civil Rights Violations

53.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1"-through "52" of the compliant as if fully set forth herein.

54.   All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

55. All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violations of 42 U.S.C § 1983.

56.     The Defendants Officers acted under pretense and color of state law and in their

individual and official capacities and within the scope of their respective employment as

NYPD officers. Said acts by the Defendant Officers were without authority of law, an abuse

of their powers, and said Defendants acted willfully, knowingly, and with the specific intent

to deprive the Plaintiff of his constitutional rights secured by Article 1, Section 12 of the

New York Constitution and the United States Constitution.

**WHEREFORE**, plaintiff respectfully requests judgment against the Defendants

as follows:

1.  On the First Cause of Action against all the Defendants, compensatory damages in an
    amount to be determined at trial, and reasonable attorney's fees and costs under 42
    U.S.C. Section 1988;

2.  On the Second cause of Action, against all Defendants, compensatory damages in an
    amount to be determined at trial.

3.  On the Third Cause of Action, against all Defendants, compensatory damages in an
    amount to be determined trial.

4.  Such other and further relief as this Court may deem necessary in the interest of justice.

Dated: May 13, 2019
       Bronx, New York

Rudy Velez, Esq. (RV-7160)
Attorney for Plaintiff
930 Grand Concourse
Suite 1A
Bronx, New York 10451
(917) 674-0573
rvesq@yahoo.com